<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KEVIN PLANKER,                          :
                                        :     Civil Action No. 13-4464 (MAS)
                                        :
                Plaintiff,              :
                                        :
            v.                          :     **OPINION**
                                        :
CHRIS CHRISTIE, et al.,                 :
                                        :
                Defendants.             :


**APPEARANCES:**

> KEVIN PLANKER, Plaintiff <u>pro se</u>
> # 926765B
> New Jersey State Prison
> P.O. Box 861
> Trenton, New Jersey 08625

**SHIPP**, District Judge

Plaintiff, Kevin Planker, a state inmate confined at the New Jersey State Prison in Trenton, New Jersey, at the time he filed this Complaint, seeks to bring this action *in forma pauperis*. Based on his affidavit of indigence and prison account statement, the Court will grant Plaintiff's application to proceed *in forma pauperis* ("IFP") pursuant to 28 U.S.C. § 1915(a) and order the Clerk of the Court to file the Complaint accordingly.

At this time, the Court must review the Complaint, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief

from a defendant who is immune from such relief.  For the reasons set forth below, the Court concludes that Plaintiff's claim asserting retaliation in violation of his First Amendment rights and his claim alleging unsanitary conditions and lack of ventilation in violation of the Eighth Amendment shall proceed at this time, but that the remaining majority of claims shall be dismissed.

## I. BACKGROUND

Plaintiff, Kevin Planker ("Plaintiff"), provides a 57-page Complaint setting forth a litany of allegations, mostly concerning the conditions of his confinement in the administrative segregation unit ("Ad Seg") at the New Jersey State Prison ("NJSP").  Plaintiff names numerous Defendants, as follows:  Governor Chris Christie; Gary Lanigan, Commissioner of the New Jersey Department of Corrections ("NJDOC"); Michelle Ricci; Charles Warren, NJSP Administrator; Jim Barnes, NJSP Assistant Superintendent; Dave Hoffman, NJSP Engineer; Donique Ivery, Nurse Practitioner at NJSP; and Rasul Saluki, Chaplain at NJSP.  (ECF No. 1, Complaint at Caption, ¶¶ 2-10.)  The Court condenses Plaintiff's prolix allegations into the following categories of alleged violations.

A.  Conditions of Confinement Claims

Plaintiff first complains that prisoners in Ad Seg are not given access to cleaning supplies upon their arrival, and are faced with dirty cells when moving into the Ad Seg.  Saturdays are designated cleaning days for Ad Seg prisoners.  They are provided with a broom, a mop that sits in dirty water, and a toilet brush that sits in a bucket of water used by the entire tier of 33 cells. Plaintiff further alleges that there is no hot water in the cells, and no cleaning rags, bleach or other cleaning products are provided to inmates, or sold in the commissary.  (ECF No. 1,

Complaint, ¶ 17.)  Moreover, without access to hot or warm water, Plaintiff cannot rinse soap from his hands and body when he washes.  (*Id.*, ¶¶136, 137.)

Plaintiff also alleges that Ad Seg inmates are allowed to shower for only ten minutes every three days.  There is no place to hang towels and clothes, or to put shampoo, except on the dirty wet floor.  He complains that the shower gate cannot be blocked by prisoners, so showering inmates may be exposed to female officers, nurses and other prison employees walking past the area.  He complains that an inmate must wear their clothes while showering for privacy and their clothes cannot be dried.  (*Id.*, ¶ 18.)   There also is no place to hang wet clothes, towels and wash rags in the cell, causing the smell of mildew from wet fabrics in the prison.  (*Id.*, ¶ 19.)

Inmates in Ad Seg are not permitted to order laundry bags or detergent from the commissary so they are unable to do laundry unless they have a laundry bag from general population.  These laundry bags usually tear and need to be sewn often, but Ad Seg inmates are not allowed to have sewing kits.  Further, because there is no hot water or wash bucket in Ad Seg, prisoners cannot wash their clothing in their cells.  Consequently, Plaintiff alleges that he has suffered from rashes, athlete's foot and jock itch since November 2012.  (Id., ¶¶ 20-22.)

Flexible mirrors are not permitted in Ad Seg, so Plaintiff alleges that he has "cut himself badly while shaving, and had irritated eyes from debris, lashes and bugs being in his eyes without being able to remove them" with aid of a mirror.  (*Id.*, ¶ 23.)  Beard trimmers also are not permitted in Ad Seg.  Plaintiff alleges that inmates must use disposable razors once every five days in the shower without a mirror and within the allotted ten minutes per shower.  The razors allegedly are made for one-time use but are changed only once a month.  The razors become clogged with hair and rust and are stored in a small cabinet that is never cleaned.

Plaintiff further alleges that the razors are placed in their designated slot by officers who do not wear gloves and handle prisoners' dirty underwear. (*Id.*, ¶¶ 23, 24.)  Plaintiff alleges that he has developed facial and neck rashes from use of these razors, but not using the razors also causes rashes from beard growth because he cannot wash his face with warm water between showers. In addition, Plaintiff alleges disparate treatment because "non-European" prisoners can order creams that remove facial and head hair, but "those creams cause burns and irritation when used by Europeans." (*Id.*, ¶ 25.)

Prisoners in Ad Seg are permitted one haircut per month but are not allowed to shower after the haircut.  Plaintiff alleges that his bedding gets contaminated with hair from being unable to shower after a haircut, causing "irritations, rashes, raw spots from scratching, discomfort, and lack of sleep." (*Id.*, ¶ 26.)

Plaintiff next complains that during strip searches, he has to remove his dirty socks and underwear, place his hands in his buttocks to spread them, and then, without being able to wash his hands with hot water, trace his fingers along the inside of his mouth and gum line.  Plaintiff alleges that lunch is often served immediately after he returns to his cell from morning yard, when a strip search is performed, and he is unable to wash his hands with hot water before eating. (*Id.*, ¶ 27.)

Plaintiff also alleges that he is not allowed to bring a pillow in Ad Seg, and that special pillows in Ad Seg are rare.  Consequently, he suffers from neck, back and shoulder pain from lack of a pillow and has difficulty sleeping.  Plaintiff further alleges that lack of a pillow hinders his ability to read, write and exercise. (*Id.*, ¶ 28.)  The bunks also have a metal lip to keep mattresses in place, and Plaintiff alleges that this metal lip causes him pain and severe cramps

when he sits on his bunk for more than a few seconds.  As a result, Plaintiff alleges that there is no place in his cell to sit and write legal documents or letters to loved ones.  He allegedly experiences welts and bruises from sitting on his bunk, which "inhibits free speech and court access." (*Id.*, ¶ 29.)

Plaintiff further complains that he cannot order spoons, forks, bowls or cups in Ad Seg, forcing him to eat with his hands, which he cannot wash with warm water before meals.  (Id., ¶ 31.)  Plaintiff also alleges that he is allowed to order only 2 toothbrushes per month, and that these toothbrushes are meant for a single use.  The toothbrushes are allegedly delivered damaged from having other items stacked on them.   The brushes become splayed and hurt Plaintiff's gums when brushing.  Plaintiff alleges that he has suffered "permanent bumps and scars" in his mouth. (*Id.*, ¶ 32.)

Plaintiff also alleges that he cannot order a watch from the commissary while he is in Ad Seg because he is limited to $15.00 purchases per month.  Without a watch, Plaintiff complains that he cannot "perform rituals at specific times for his religion."  He also contends that he has a constitutional right to know what time it is.  (*Id.*, ¶ 33.)  Plaintiff also is not permitted to buy nail clippers and must use clippers provided during showers.  He complains that the clippers are damaged and dirty, and it is difficult to use them in the shower.  Consequently, Plaintiff "is reluctant to use them and gets ingrown nails." (*Id.*, ¶ 34.)

Plaintiff next complains about the prices of commissary items.  He alleges that he is allotted $15.00 per month for commissary, minus 10% for fines, leaving him with $13.50 to spend for certain items he deems essential.  The prison provides monthly bags of pen and paper, deodorant, and toothpaste, but Plaintiff alleges that he needs Sensodyne toothpaste, which costs

$7.23.  He also has dandruff and needs Head and Shoulders shampoo, which costs $7.69, and Neutrogena soap, which costs over $9.00 for three bars.  Thus, he can only order one of these items per month.  A bath towel is $5.00; shower shoes are $2.57; and shaving cream is $4.58 per month.  Dry-skin lotion, lip balm, conditioner, cotton swabs, toothbrushes, and wash cloths are not included in the essential items package provided by the prison.  Plaintiff alleges that it would take several months to "stock up on the essential items, not to mention writing paper, security pens, envelopes, and postage stamps."  Therefore, he is forced to choose between essential toiletries and writing to loved ones.  (*Id.*, ¶ 35.)

Plaintiff also alleges that there is no protection from "excessive weather" in the Ad Seg unit.  Cool-off showers and ice during heat waves were eliminated in 2011 for no apparent reason.  The heat does not work, broken windows and open exhaust fans allow cold air, rain and snow to come inside the building.  In the yard, there is no protection from the sun, and Plaintiff alleges that he is not permitted to order sunblock or shade himself with a hat.  He also alleges that he cannot wear rain gear, and if it is raining in the yard, he has no means to dry his sneakers and clothes.  (*Id.*, ¶¶ 37, 156.)  Plaintiff further alleges that there is an infestation of mice, birds and insects that has caused him to suffer allergies and asthma, bug bites and sleeplessness.  There is a smell of mouse urine and feces, which is never cleaned.  The mice also crawl up on the bunks.  These pest infestations have caused Plaintiff to suffer rashes, abrasions from scratching, depression and constant itching, leaving him tired and unable to sleep or concentrate.  (*Id.*)

Plaintiff next alleges that the toilet in his cell is impossible to clean and had urine and feces all over it from prior inmates when he was moved to his cell.  He alleges that he would not use the toilet until he could no longer hold his urine.  To use the toilet, Plaintiff has to sit on a

dirty steel shelf with his penis rubbing against the metal lip that causes cuts and scrapes on his genitals.  Plaintiff also alleges that it "is impossible to urinate in the toilet without getting urine all over the metal around the hole because the wall above the toilet shelf prevents [him] from leaning directly over the hole, so the metal constantly smell like years and years of built-up urine from numbers of prisoners, and the sink is used as a urinal, so it smells.  The water flushes on only one side, so fecal matter is smeared on the back of the toilet where it is never fully cleaned, and there is a constant stench of rotting fecal matter and stale urine."  (*Id.*, ¶¶ 38, 39, 40.) Plaintiff further alleges that cleaning products are not provided the inmates to clean the toilets, and there is no hot water to wash hands after toilet use.  (*Id.*, ¶ 40.)

Plaintiff next alleges that the sheets and blankets provided in Ad Seg are torn and fail to cover the entire bunk.  (*Id.*, ¶ 41.)  Ad Seg inmates receive less food than in general population. For instance, soup, muffins and donuts are not served in Ad Seg.  (*Id.*, ¶ 42.)  Plaintiff also contends that he is forced to work without compensation.  Namely, he had to clean his cell, the showers and remove debris on his tier, as well as hand out food, juice, coffee and supplies on his tier, from November 2012 to July 2013, without pay.  (*Id.*, ¶ 43.)

Plaintiff further alleges that most everything in the Ad Seg unit is made of metal, which has rusted and jagged edges.  The shower gate is rusted and Plaintiff is scraped by reaching through to get his razor or clippers from the guard.  His cell door has rusty bars with jagged edges and there is a broken rusted hook on the wall.  Plaintiff alleges that he has permanent scars on his hands and fingers from the rusted metal, which were never treated despite his requests.  In addition, Plaintiff's requests to Defendant Dave Hoffman to have the rusted metal repaired have been ignored.  (*Id.*, ¶ 44.)

Plaintiff also contends that the water in the showers is so hot that it burns. (*Id.*, ¶ 45.) On one occasion in 2013, Plaintiff burned his hand from contact with the copper pipe leading to the shower head. Plaintiff alleges that he has a permanent scar where no hair grows from this burn. Plaintiff has complained to Defendant Hoffman regarding the shower water temperature and was allegedly told it was Plaintiff's fault due to his many grievances filed. (*Id.*, ¶ 46.) He also complains that the water pressure in his cell fluctuates from gushes to trickles, and his water never turns off, so there is rust, mold and mildew on the walls, floor and bed. (*Id.*, ¶ 150.) Moreover, the air and ventilation in his unit do not work properly, so it becomes too hot and difficult to breathe and sleep. His complaints to Defendants Warren, Barnes, and Hoffman, about this ventilation problem allegedly have been ignored. (*Id.*, ¶ 134.)

Plaintiff complains that there is no room in his cell to exercise. The cell is about 4½ feet wide, with the bunk taking half the space on one side and a shelf on the opposite wall taking another foot of space. Plaintiff alleges that, in January 2013, he tried to do push-ups in his cell and he banged his head on the shelf, knocking himself out and causing a cut on his head. He alleges that he has a permanent scar on his head and a disfigured finger. Plaintiff also alleges that "his body has reacted to over half a year of not being able to move around safely. Now he experiences pain from trying to move around or stand, and spend up to 72 hours in one position." (Id., ¶ 53.)

B. Access to Courts and Disciplinary Charges Claims

Plaintiff alleges that remedy forms are available only through the social workers. From October 2012 through July 2013, the social workers often said they did not have any remedy forms or give Plaintiff only one or two forms at a time upon request despite Plaintiff's request

for more forms.  (*Id.*, ¶ 51.)  In October 2102, while Plaintiff was in Ad Seg, he allegedly could not prepare his defense or appeal on an institutional charge because he did not have writing paper or pen.  (*Id.*, ¶ 52.)  Plaintiff also alleges that inmates may not purchase firm brief cover paper or the colored cover paper required by New Jersey state court rules.  (*Id.*, ¶ 54.)

Plaintiff also complains about a disciplinary charge for refusing to submit a urine sample. He admits that he was found "not guilty," and then filed complaints about the process.  Namely, Plaintiff alleges that staff officers give inmates a two-hour notice for the urine test, but don't show up until the two hours elapse.  During this time, inmates must hold their urination or face disciplinary charges.  Plaintiff argues that this procedure was "unfair."  (*Id.*, ¶ 55.)

In September 2012, Plaintiff allegedly was informed at 10:30 a.m. that he would have to provide a urine sample within two hours.  The entire unit was then "given a form around 12:30 p.m. stating that notice for two hours had been given at 1:00."  (*Id.*, ¶ 56.)  Plaintiff alleges that there are 48 cells in his unit, with two inmates per cell.  Consequently, he alleges that there was not enough staff to test these inmates within two hours.  (*Id.*)  Plaintiff and his cellmate were taken from their cells several hours later and were asked to produce urine samples.  Plaintiff alleges that he asked to have an additional two hours because he had been unable to hold his urine since 10:30 a.m., and had urinated 20 minutes beforehand.  Plaintiff allegedly was forced to provide what little urine he could at that time.  His urine sample later disclosed THC and Plaintiff was taken to detention.  Plaintiff defended against the disciplinary charge by claiming that he had eaten a Strawberry Hemp Granola from a food package and should be given another two hours to submit a urine sample.  Plaintiff alleges that he gave this statement the next morning to the staff sergeant who delivered the disciplinary charge on Plaintiff.  Plaintiff also

alleges that he asked for a paralegal to go to Plaintiff's cell and obtain the granola bag for evidence of the ingredients.  However, the paralegal allegedly refused to aid Plaintiff because they had a prior altercation.  Plaintiff alleges that he was refused an alternative paralegal.  Plaintiff was found guilty of the disciplinary charge and asked the paralegal to file an appeal.  He alleges that he has not received a copy of the appeal.  He also alleges that he did not learn until much later that he was sanctioned to a year in administrative segregation, a year of urine monitoring, loss of commutation credits and required attendance in a 12-step program.  (Id., ¶¶ 56-59.)

Plaintiff received another disciplinary charge while confined in Ad Seg for sending money to the friend of another prisoner.  At his courtline hearing, Plaintiff "presented evidence of a flyer showing that he had been deceived into believing that the person he sent money to would provide legal services, order gifts for loved ones, perform secretarial services and do many other things for prisoners."  Plaintiff alleges that nothing in the flyer indicated that the person providing services was associated with any prisoner.  (*Id.*, ¶ 60.)  Plaintiff also defended himself by arguing that he was not allowed to check the legitimacy of the flyer for services.  Plaintiff then alleges that he was found guilty of the charges after the hearing on the basis that he had pled guilty to the charge.  Plaintiff alleges that his requests for legal assistance to file an appeal were denied, and he wrote an appeal on the back of medical forms to be copied, but the form was never returned to him.  Plaintiff further alleges that he is deprived of legal access while confined in Ad Seg because he has to rely on and pay outside services to type and copy his legal documents, including this Complaint.  He also alleges that the flyer offering legal services,

which was the basis of his disciplinary charge, was displayed in the prison law library.  (*Id.*, ¶¶61, 62.)

Plaintiff further complains that he was denied access to the courts because he does not have safe seating or writing access, he is unable to purchase envelopes large enough to mail copies of briefs to the courts, and he has not received copies promptly.  (*Id.*, ¶¶ 152, 153, 160.) Plaintiff also alleges that his mail was often sent to the wrong unit, which slowed down his ability to file suit.  (*Id.*, ¶ 124.)  He contends that these deprivations have resulted in his inability to file documents on time, resulting in dismissal of his case.  (*Id.*, ¶ 160.)  Finally, Plaintiff makes the  general allegation that he has been denied due process in disciplinary proceedings because he was not allowed to see or present evidence, or file an appeal.  (*Id.*, ¶ 143.)

C.  Food and Nutrients

Plaintiff next asserts claims regarding his diet.  Plaintiff states that he is lactose-intolerant and does not consume meat or any animal-derived foods due to his beliefs as an "Organic Odian."  Plaintiff admits that the prison has approved him for a vegetarian diet but not a vegan diet.  He complains that the vegetarian trays contain fewer nutrients and calories than a regular diet.  Moreover, the vegetarian diet contains a lot of milk and cheese, which Plaintiff cannot consume due to his lactose intolerance.  Plaintiff also suffers a nut allergy.  Plaintiff further complains that the quality of the food being served is inferior.  Salads taste like pesticides.  Fruits are often old, dried out, or rotten.  Vegetables are cooked so much that they lose any nutritional value.  Consequently, Plaintiff complains that he receives less protein, nutrients and calories than other prisoners not on a restricted diet.  He also complains that his dietary restrictions and religious beliefs are disregarded by the prison.  (*Id.*, ¶¶ 63-71.)

11

Plaintiff further alleges that he is deprived of drinking water.  The water in his sink is discolored and has a bad odor so he cannot drink it, and Plaintiff can order only six bottles of water at one time.  (*Id.*, ¶ 73.)

Plaintiff next complains that "meal runners" handle food trays without wearing gloves or hair nets.  These meal runners also are not checked for medical clearance like other food workers or cooks, and they are not trained to wash their hands before serving trays.  As a result, Plaintiff refrains from eating when his meals are served by these runners.  Plaintiff also avoids eating or drinking anything that is not sealed or cleaned, like coffee and juice containers.  (*Id.*, ¶¶ 74-76.)

Plaintiff further alleges that when he is moved from one housing unit to another, which happened four times from 2011 to 2013, his records take a long time to reach his new location. Consequently, Plaintiff allegedly went for several months without his vegetarian trays, despite numerous requests and grievances filed.  Further, there are no nutritional foods offered for sale in the canteen.  A prisoner has to remain charge-free for one year to order healthy foods, and then may order only from a vendor called Apple Valley, which sells organic grains, nuts, seeds and mushrooms, but no fruits or vegetables.  Plaintiff concedes that the prison is not obligated to pay for Plaintiff to have an organic whole food diet, but he does contend that he has a right to order and consume such foods at his own expense so that he can maintain his religious and vegan diet. Plaintiff complains that there is a disparity in access to religious foods "because there are Kosher and Halal foods available on commissary and through food packages for Jewish and Muslim prisoners, but there are no 100% whole organic foods available for Plaintiff."  (*Id.*, ¶¶ 77-80.) Plaintiff further alleges that there is a great disparity in the quality of the food offered in the

Officer's Dining Room to that which is served to the prisoners, despite the fact that the same food service is used for both.  (*Id.*, ¶ 81.)

Finally, Plaintiff alleges that his requests to be provided with information pertaining to the ingredients in the food he is served are ignored.  (*Id.*, ¶ 145.)

D.  Recreation

Plaintiff alleges that Ad Seg inmates have yard recreation once every five days, for two and a half hours, alternating between morning and afternoon hours each time.  Plaintiff complains that he does not have access to sunblock, hats or rain gear for the yard, and that no drinking water and toilet access is allowed during yard recreation time unless the inmate asks a corrections officer to open the security gate to use the toilet or obtain drinking water.  No water bottles or cups are permitted during yard time.  Plaintiff also alleges that prisoners often soil themselves in the yard when "count times," codes, or movements take place because these inmates cannot leave the yard during that time period.  (*Id.*, ¶ 82.)

Plaintiff further complains that inmates without watches or clock alarms, like Plaintiff, must stand at the gate at 5:30 a.m. to get on the yard list.  Sometimes yard recreation is canceled due to excessive heat or other weather conditions, but there is no make-up period, resulting in no yard recreation for ten or more days.  (*Id.*, ¶ 83.)  Shoes must be worn in the yard due to the course ground surface.  Plaintiff complains that shoes are so inadequate that they break apart after a few yard periods, and then it takes almost five months for new shoes to be delivered.  In October 2012, Plaintiff wore boots to the yard, but these were not permitted and the boots were confiscated.  Plaintiff missed yard time until February 4, 2013, when his new shoe order arrived. (*Id.*, ¶¶ 84, 85.)

13

Plaintiff next alleges that prisoners are often sanctioned with the Loss of Recreation Privileges ("LORP") for prison disciplinary actions. Plaintiff was sanctioned with LORP on several occasions, allegedly for false disciplinary charges, and Plaintiff had to go without yard recreation for a period of time. (*Id.*, ¶¶ 86, 87.) Plaintiff contends that, because he is lactose intolerant, the only way he can maintain healthy levels of Vitamin D is through exposure to sunlight and consumption of mushrooms. However, his cells do not provide open windows for fresh air and sunlight, and he must remain charge-free for one year to order mushrooms. Plaintiff complains that most inmates in prison have "darker skin" and can tolerate the sunlight in the yard, but Plaintiff has fair and sensitive skin, which deprives him of "equal recreation, fresh air, sunlight, and Vitamin D." (*Id.*, ¶ 88.)

Plaintiff also alleges that he is often forced to choose between attending yard or religious services because Odinist services are typically scheduled during yard times. Other times, Plaintiff is scheduled to work or has medical passes during his yard time. Yard time often falls on Saturdays, which is the only day Plaintiff can clean his cell, so Plaintiff is forced to choose between yard time and having access to cleaning supplies. From January 22, 2013 through July 16, 2013, Plaintiff's yard time was canceled on three occasions (on January 22nd, March 3rd, and March 8th, for repairs and snow), and he missed yard once on February 1st for a dental appointment. Plaintiff alleges that it was either raining or snowing, or too hot during the remaining 12 yard times, but yard was not canceled and Plaintiff attended yard recreation. (*Id.*, ¶¶ 89-91.)

Plaintiff further alleges that yard times and amenities are different for the general population versus Ad Seg inmates. For instance, general population yards have ice water

containers available in the yard and general population inmates may bring cups to the yard. Ad Seg prisoners are not afforded the same access to water. General population inmates also have more yard time and have access to weights and handball during yard, unlike Ad Seg inmates. Plaintiff alleges that due to the lack of water in yard and the lack of room in his cell, he has been prevented from exercising since he was placed in Ad Seg in October 2012. (*Id.*, ¶¶ 92-95.)

Plaintiff finally alleges that the Ad Seg yard has urine and feces in the corners because other inmates relieve themselves outside when they cannot gain entrance to the bathroom. The stench causes Plaintiff to decline yard recreation. He complains that yard recreation could occur more frequently than once every five days if the amount of yard time is reduced from two and a half hours to one hour each time. (*Id.*, ¶¶ 146, 147.)

E. Religious Exercise

Plaintiff complains that, for two years before October 2012, religious services for Odinists were often scheduled during lunch or yard times and that Plaintiff was forced between choosing to attend his religious services or go to lunch or yard.  Other religious services are afforded more time and are called after lunch.  In addition, Odinist services, which are scheduled on Tuesdays, were canceled many times and not re-scheduled, often because the person who oversees the Odinist services will take Tuesdays off when a holiday falls on a Monday.  Plaintiff has repeatedly requested head Chaplain Imam Saluki to change the service for the Odian ritual from Tuesday to Wednesday accordingly, but has been told to "either suck it up and stop thinking the prison revolves around his white religion, or to become a Muslim and stop being a non-believer." (*Id.*, ¶¶ 96-98.)

Plaintiff alleges that he also requested equal access to the grass area where other religious outdoor services are held, but the Odinists services occur on the concrete.  Before the "Yule" holiday in 2012, when Plaintiff first arrived in Ad Seg, Plaintiff requested a Yule tray for his high feast and the weekly two boxes of juice given to Odinists, but his request was denied.  On December 21, 2012, the Imam and another civilian Muslim told Plaintiff that only Muslims may receive food and drinks in Ad Seg, and that Plaintiff should consider becoming a Muslim if he wanted to celebrate a holiday in Ad Seg. (Id., ¶¶ 99, 100.)

Plaintiff further alleges that in 2011, he submitted ten written or verbal requests to Imam Saluki for permission to use or retain certain items utilized in Odinist rituals, such as a troth ring, Thor's Hammer, runes, herbs and spices, rune cloth, alter cloth, fresh tree twigs, mushrooms, sea salt, candles, Wyrd's Web materials, and a wyte plant to plant in the 3-wing garden.  Plaintiff

alleges that he showed Imam Saluki certain pages from "Organic Odianism: The Path to Oneness," which lists these requested items as "obligatory items" for Organic Odians. Imam Saluki allegedly rejected Plaintiff's requests with racist and pro-Islamic comments. Plaintiff's remedy forms filed with the prison administration and the Commissioner's Office also were rejected. Specifically, Plaintiff alleges that Defendant Jim Barnes responded with racist comments and told Plaintiff that changes could be made if Plaintiff continued working. Plaintiff alleges that it is against his "sincerely held beliefs to submit to a higher power," but he has been denied contact visitation privileges unless he attends a 12-step program that involves submitting to a higher power. Plaintiff contends that this violates his First Amendment rights to free exercise of his religion, and that the denials of his requests for a music program, religious instruction and for Odinist services to be held on Wednesday violate his right to equal treatment. (*Id.*, ¶¶101-105.) Finally, Plaintiff alleges that he was forced to take repeated TB tests against his religion. (*Id.*, ¶ 129.)

F.  <u>Movies and Cable Television</u>

Plaintiff next complains that prisoner money was used to rent daily movies or set up a Netflix account, but new movies were rarely shown. He alleges that less than 15% of movies were played for inmates. Plaintiff also alleges that less than 30 educational videos were shown from June 2011 through July 2013, although many times such movies were delivered to the educational department. After numerous inmate complaints over this problem with movies, the NJSP prison administration, and Defendant Barnes in particular, allowed prisoners to have cable television, but every non-basic station, including educational and PBS stations, were programmed out by the prison staff. Plaintiff contends that these stations do not present a

security concern.  He further alleges that every week Spanish-speaking movies are shown without English subtitles.  (*Id.*, ¶¶ 106, 107.)

G.  Denial of Medical Treatment

Plaintiff alleges that for two years his requests for medical care were not answered. Sometimes a nurse would come to his cell but Plaintiff was not taken to see a nurse practitioner. One time he was charged for a medical visit that did not happen, and a prescription that he did not receive.  He was told that he would be scheduled for an eye exam that never occurred.  He was given an EKG on February 27, 2013, in response to a sick call concerning chest pains, breathing problems and temporary blindness.  Plaintiff alleges that a doctor told him these symptoms related to Plaintiff's lack of exercise and poor eating habits.  The doctor allegedly told Plaintiff that he would be given nutritional supplement shakes and Vitamin D supplements, but Plaintiff was then offered only pain pills, which he refused.  (*Id.*, ¶¶ 110, 111.)

In April 2013, Plaintiff submitted a sick call request and was sent to Defendant Donique Ivery, a nurse practitioner.  Plaintiff had complained of many things, including a sore throat and allergies, but his sore throat had dissipated by the time of his sick call visit.  Plaintiff tried to tell Ivery about his many problems, such as hunger pangs, dizzy spells from excessive weight gains and losses and "seemingly allergic reactions to certain foods," but Ivery kept interrupting Plaintiff and told him that these complaints were the result of Plaintiff's picky eating habits, despite Plaintiff's reference to his religious vegan diet, his lactose intolerance, and bad reactions to peanuts, soy and gluten.  Ivery took Plaintiff's blood pressure, which was high, and told Plaintiff to get his cholesterol checked.  She also allegedly told Plaintiff that his hunger pangs were good because Plaintiff was obese, and that Plaintiff would get better food once he was back

in general population.  Plaintiff was dismissed from examination and as he was being escorted back to his cell, he mentioned that his sick call slip had listed complaints of bed sores, allergies, sore gums from a splayed toothbrush, pains in his neck, back and shoulder from not having a pillow, and other issues that were not addressed.  He alleges that his cholesterol was never checked.  (*Id.*, ¶ 112.)

Plaintiff complains that he never had any privacy on his medical visits and he was teased by officers who eavesdropped on his complaints.  He went without eyeglasses for several years and was not scheduled for an eye examination.  He was prevented from purchasing nicotine products despite his nicotine addiction.  Only nicotine lozenges were provided to prisoners due to a non-smoking policy, but they were not provided to Plaintiff in Ad Seg.  (*Id.*, ¶¶ 113-115.)

Plaintiff next lists a litany of ailments and injuries for which he alleges that no medical treatment was provided after numerous requests from November 2012 to April 2013.  For instance, Plaintiff alleges that he had cuts on his hands from rusty jagged metal in his cell unit, cuts from hitting his head on the shelf in his cell, burns from hot water in the shower, a "wart or pox infestation" all over his body, "dizziness, lightheadedness, temporary blindness in one eye, chest pains, migraines, muscle spasms, allergies, rashes, athlete's foot, bed sores, irritated and bleeding gums,  scarred and blistering areas in mouth, scratchy and oily eyes, arthritic cramps in hands and right foot, excessive weight gain and loss, hunger pangs, back [pain], potential concussion, disformed [sic] and finger that keeps getting stuck open, spasms, scrapes from the toilet on his penis, infected burn and cut, severe depression, insect bites, and ingrown toe nails and ingrown hairs, indigestion/heartburn/acid reflux, asthma, sunburn, arthritic pain, muscle spasms and other issues."  (*Id.*, ¶ 116.)

Plaintiff further alleges that his requests for mental health treatment were ignored for several months from late October 2012 to April 2013.  He complained of severe depression, attention deficit and constant sleepiness.  Plaintiff alleges that he was told mental health treatment would not be provided to him in Ad Seg, and that he could attend yard recreation, exercise and take medication to alleviate these symptoms.  Plaintiff was eventually seen by a doctor in mid-April 2013, who simply gave Plaintiff a pill to help Plaintiff sleep.  Although Plaintiff had complained about sleeping too much, he took the pill, but it made his sleepiness worse so Plaintiff asked to be taken off the pill.  Another doctor then placed Plaintiff on a different pill.  Plaintiff claims that he asked for literature on depression and alternatives to medication, but the doctors did not provide any to him.  Finally, yet another doctor handled Plaintiff's issues for several weeks and gave Plaintiff the literature he had sought.  The doctor also advised Plaintiff to get more sunlight and recreation, and to do breathing exercises.  This last doctor was soon replaced by the first doctor, and the medication regimen was reinstated. Plaintiff complains that his medication often changed and he would refuse to take his medication out of concern that the changes had been made in error.  Finally, he complains that these doctors only examined and spoke with Plaintiff for 45 seconds each visit.  (*Id.*, ¶¶ 117, 118.)

Plaintiff also alleges that he did not receive medical attention for smoke inhalation after a fire broke out in his unit in November 2012.  He also complains that he did not receive medication and cream for his rashes and bites that he requested in June 2013.  (Id., ¶¶ 130, 131.)

H.  Miscellaneous Claims

Finally, Plaintiff sets forth an omnibus collection of complaints regarding his confinement in Ad Seg.  Most of these complaints are reiterations of the above-listed claims, and

will not be re-stated here.  However, new or additional complaints are recorded as follows.

Plaintiff's requests for dental floss were ignored, depriving him of the means to floss his teeth.  He also has dental cleanings once every two years instead of the American Dental Association recommendation of twice each year.  (*Id.*, ¶¶ 125, 154, 155.)  Plaintiff allegedly was prevented from ordering containers to keep his property free from infestation in his cell.  (*Id.*, ¶ 132.)  He also can't replace a fan (necessary due to excessive heat in his cell) and his bowls and cups that were damaged or destroyed when he was packed and moved to Ad Seg in October 2012.  (*Id.*, ¶ 133.)  Further, the spoons sold in the commissary are flimsy and can be used only once, and inmates can order only four per month.  (*Id.*, ¶ 157.)

Defendant Barnes allegedly retaliated against Plaintiff by placing him in a cell behind an old heater that blocks sunlight from reaching Plaintiff.  The heating unit is never cleaned and has rotting food and mice feces under it.  (*Id.*, ¶ 126.)  Plaintiff further alleges that Barnes threatened to punish Plaintiff, by putting him on the "dungeon flats" where there is mice infestation and no sunlight due to the old heating unit, if Plaintiff continued to file grievances.  Plaintiff alleges that he continued to file grievances and Barnes then moved Plaintiff to the only dungeon-like area in Ad Seg.  Plaintiff alleges that his cell-mate who was sanctioned at the same time as Plaintiff, went to Level 2 and was promptly moved to the lighter, fan-exposed tiers in February 2013, but Plaintiff remained in the dungeon-like cell even though he was a Level 2.  Plaintiff alleges that Barnes told him that Plaintiff would never be able to prove anything and that Barnes would charge Plaintiff with fraud and lying if Plaintiff complained.  Barnes allegedly told Plaintiff that he did the same to another inmate, who confirmed this retaliatory treatment to Plaintiff, so Plaintiff refrained from filing a lawsuit at that time.  (*Id.*, ¶¶ 138, 139.)

21

Plaintiff alleges that, from July 2011 to October 2012, he was forced by Defendants Warren, Barnes and Hoffman to perform various skilled jobs, ranging from plumbing, electrical and painting, in exchange for para-professional pay of $5.00 per day, reimbursement for materials used, approval of Plaintiff's father and brother for visitation, and Odinist services to be held in the 3-wing garden. He alleges that he was denied painter's pay on two occasions, but the other privileges were not provided as promised. Plaintiff did have his word processor returned to him, but the unit was damaged. (*Id.*, ¶¶ 127, 140, 141.) Plaintiff's commutation credits were not restored even after he went a long period of time with no disciplinary charges. (*Id.*, ¶ 142.)

Plaintiff also alleges that he was not allowed to purchase literature on medical marijuana growth because it is a security threat. He contends that the security concern is exaggerated because there is no way a prisoner can grow marijuana in prison. Plaintiff further alleges that he is subjected to atypical hardships in Ad Seg in comparison to the general population inmates. (*Id.*, ¶ 143.) Plaintiff claims that he is a white man "surrounded by non-whites who commonly express hatred toward whites," and that he is "being forced to live in a cell with hate-filled non-whites." (*Id.*, ¶ 144.) He also complains that special needs inmates are housed near him and they throw feces and urine at each other, and yell and bang on their cells at all hours, which prevents Plaintiff from sleeping or concentrating on research, reading and self-education. (*Id.*, ¶ 148.)

Plaintiff further claims that the administration has stopped issuing written memoranda to inmates, and instead has memos posted on the video bulletin board or on the housing unit bulletin board. Plaintiff complains that the video bulletin board is fuzzy or runs too fast, and that Ad Seg inmates often don't have access to televisions. Further, he does not have the time to look

at the housing unit bulletin boards because he has to go directly to his cell without stopping. Consequently, Plaintiff alleges that he is not timely informed about policy memorandums. (*Id.*, ¶ 151.)

Finally, Plaintiff alleges that he is not permitted to write a book or create any publications in prison, and that he is denied equal access to news, education and entertainment since he has been confined to the Ad Seg unit, while other inmates are permitted to have radios. (Id., ¶¶ 158, 159.)

Plaintiff seeks the "highest amount of monetary relief" in compensatory, punitive and nominal damages. He also seeks injunctive relief requiring Defendants to remedy the complaints asserted in this action. (*Id.*, "Relief" at 57.)

## II. STANDARDS FOR A SUA SPONTE DISMISSAL

The Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996), requires a district court to review a complaint in a civil action in which a prisoner is proceeding *in forma pauperis* or seeks redress against a governmental employee or entity. Specifically, the PLRA directs the district court to screen the complaint for cognizable claims and to *sua sponte* dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. This action is subject to *sua sponte* screening for dismissal under both 28 U.S.C. § 1915(e)(2)(B) and § 1915A.

The Supreme Court refined the standard for summary dismissal of a complaint that fails to state a claim in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Citing its opinion in *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544 (2007) for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), the Supreme Court held that, to prevent a summary dismissal, a civil complaint must now allege "sufficient factual matter" to show that the claim is facially plausible. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)(citing *Iqbal*, 556 U.S. at 676). *See also Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) ("The touchstone of the pleading standard is plausibility. ... "[A]llegations that are no more than conclusions are not entitled to the assumption of truth; ... [a court should] "look for well-pled factual allegations, assume their veracity, and then 'determine whether they plausibly give rise to an entitlement to relief.'") (citations omitted). In short, "[a] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211 (citing *Iqbal*, 556 U.S. at 678-79). Thus, while pro se pleadings are liberally construed, *Higgs v. Atty. Gen.*, 655 F.3d 333, 339 (3d Cir. 20011), "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted). Nonetheless, courts must be cognizant that the *Iqbal* standard "is not akin to a probability requirement." *Covington v. International Association of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679).

### III.  SECTION 1983 ACTIONS

Plaintiff brings this action pursuant to 42 U.S.C. § 1983.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen

24

of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

## IV.  DISCUSSION

A.  Access to Courts Claim

Plaintiff alleges that Defendants have denied him access to the courts in several ways. He alleges that, from October 2012 through July 2013, he was given only one or two remedy forms at a time despite his requests for more forms.  He also claims that he did not have writing paper or pen in October 2012 to prepare his defense to an institutional charge.  Plaintiff also generally alleges that he does not have safe seating or writing access, cannot purchase envelopes large enough to mail briefs to the court, does not receive copies promptly, and his mail is often sent to the wrong unit, which have resulted in his inability to file documents on time and dismissal of his case.

"Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts."  *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (citing *Lewis v. Casey*, 518 U.S. 343, 346 (1996)).  "Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an 'actual injury'—that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other "remedy that may be awarded as recompense" for the lost claim other

25

than in the present denial of access suit." *Id.* (citing *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). Thus, to satisfy the requisite pleading requirements, "[t]he complaint must describe the underlying arguable claim well enough to show that it is 'more than mere hope,' and it must describe the 'lost remedy.'" *Id.* at 205–06 (footnote omitted) (citing *Christopher*, 536 U.S. at 416–17).

In *Monroe*, the Third Circuit determined that the complaint failed to state an access to courts claim upon which relief could be granted and stated the following:

> In this case, the defendants confiscated all of the plaintiffs' contraband and non-contraband legal materials, including their legal briefs, transcripts, notes of testimony, exhibits, copies of reference books, treatises, journals, and personal handwritten notes. In their initial pleadings, the plaintiffs' claim rested solely on the ground that the defendants confiscated their legal materials, contraband and non-contraband alike. That claim, on its face, was insufficient to state a claim under *Harbury*. So too were their subsequent amendments, which alleged that they lost the opportunity to pursue attacks of their convictions and civil rights claims but did not specify facts demonstrating that the claims were nonfrivolous. Nor did they maintain that they had no other remedy to compensate them for their lost claims. Even liberally construing their complaints as we must do for pro se litigants, they do not sufficiently allege that they have suffered an actual injury.

536 F.3d at 206 (internal citation and footnote omitted).

Despite the verbosity of his Complaint, Plaintiff fails to describe the underlying arguable claims that he was prevented from raising due to the alleged deprivations cited above; nor has Plaintiff identified an actual injury other than a general allegation that some unnamed case was dismissed.   It also is plain from his allegations that Plaintiff has repeatedly filed grievances and was not prevented from filing this action in federal court.  Moreover, Plaintiff admits that he is provided monthly bags of pens and paper at prison.  (ECF No. 1, Compl. at ¶ 35.)  Therefore, pursuant to the pleading standards set forth above, Plaintiff has failed to state a First and

Fourteenth Amendment access to the courts claim. As it is possible that an amendment could cure this deficiency, the dismissal of this claim will be without prejudice.

B.  Disciplinary Charges Claim

Plaintiff next takes issue with several prison disciplinary charges for which he was found guilty and sanctioned.  Plaintiff admits that he received hearings on these charges, that he was provided with a paralegal (although not one to his liking), and that he appealed the findings and sanctions.  It does not appear, however, that he has exhausted his administrative and state court remedies with regard to his prison disciplinary charges.  Because Plaintiff did not exhaust these claims during his administrative appeals of the disciplinary proceedings, they are procedurally defaulted for purposes of his § 1983 action.  *See Spruill v. Gillis*, 372 F.3d 218, 231–32 (3d Cir.2004); *Torres v. Clark*, 522 F. App'x 103, 106 (3d Cir. 2013).  Moreover, the filing of false disciplinary charges, as Plaintiff appears to assert here, does not constitute a claim under § 1983 as long as Plaintiff was granted a hearing and an opportunity to rebut the charges.  *See Smith v. Mensinger*, 293 F.3d 641, 653-54 (3d Cir. 2002); *see also Crosby v. Piazza*, 465 F. App'x 168, 172 (3d Cir. 2012).    Therefore, Plaintiff's claims concerning disciplinary charges and disciplinary due process are dismissed with prejudice.

C.  Recreation Claim

Plaintiff next makes a claim that he is denied recreation in violation of his Eighth Amendment rights.  While the denial of exercise or recreation in some circumstances may result in a violation of the Eighth Amendment, *see Peterkin v. Jeffes*, 855 F.2d 1021, 1031–33 (3d Cir. 1988), "a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *Fantone v. Herbik*, 528 F. App'x 123, 127 (3d Cir. 2013) (quoting *May v. Baldwin*,

27

109 F.3d 557, 565 (9th Cir.1997)).  *See also Gattis v. Phelps*, 341 F. App'x 801, 805 (3d Cir. 2009); *Knight v. Armontrout*, 878 F.2d 1093, 1096 (8th Cir.1989) (denial of outdoor recreation for thirteen days not cruel and unusual punishment).

In *Gattis*, the Third Circuit Court of Appeals noted that minimal provision of exercise and recreation can satisfy the Constitution.  *Gattis*, 344 F. App'x at 805 (limited exercise with no guarantee of outdoor recreation does not implicate the Eighth Amendment).  A denial of exercise or recreation only results in a constitutional violation "if such denial is sufficiently serious to deprive the prisoner of the minimal civilized measure of life necessities."  *Id.*

Based upon a liberal reading of this *pro se* Complaint, this is not a case where a prisoner is alleging denial of all recreation or exercise opportunities.  Rather, Plaintiff contends only that the conditions and timing of his yard recreation are not optimal for him.  For instance, he complains that he does not have sun block or rain gear to protect him from the elements.  He also complains that he has to wait to use the bathroom, and that some inmates urinate in the yard.  Plaintiff further alleges that yard recreation has been cancelled due to excessive heat or weather conditions.  However, Plaintiff submits a record of his yard time, which shows that it was cancelled only three times in a seven month period due to snow and repairs, and that Plaintiff missed one time due to a dental appointment.  (ECF No. 1, Compl. at ¶¶ 89-91.)  Plaintiff does not allege that he has missed yard for more than a ten-day period.  In addition, Plaintiff does not assert that he is denied any exercise or recreation.  He may exercise in his cell but chooses not to

because of the size of his cell.[1]  He also has access to yard recreation, but appeared to forego yard time on a few occasions by his own choice.

Indeed, this Court observes that much of Plaintiff's allegations pertaining to yard recreation involve complaints that general population has better yard times and amenities than that afforded Ad Seg inmates.  Plaintiff also makes a cloaked racial complaint that due to his fair and sensitive skin, he is denied equal yard recreation in contrast to inmates with "darker skin." But as noted above, Plaintiff's allegations show only that he himself has chosen to forgo yard recreation by his own choice.  Indeed, none of Plaintiff's allegations support a cognizable claim of a constitutional deprivation.  Consequently, because Plaintiff's allegations do not satisfy the standard set forth in *Gattis*, *supra*, namely, that Plaintiff's alleged denial of outdoor recreation is not sufficiently serious to deprive the prisoner of the minimal civilized measure of life necessities, this claim is dismissed with prejudice for failure to state a claim.  *See Gregorio v. Aviles*, No. 11–2771, 2013 WL 1187096, at *6 (D.N.J. March 20, 2013) (dismissing claim of denial of outdoor recreation to pre-trial detainee for ten months); *Miller v. Trometter*, No. 4:11–811, 2012 WL 5933015, at *11 (M.D.Pa. Nov.27, 2012) (Nealon, J.); *Wyland v. Brownfield*, No. 08–1601, 2011 WL 5445305, at *7 (W.D.Pa. Nov. 9, 2011) (dismissing claim of denial of outdoor exercise where Plaintiff failed to allege that he was precluded from any form of exercise or that he sustained a specific injury from lack of exercise).

D.  Religious Exercise Claim

Plaintiff identifies himself as an "Organic Odian."  He alleges that Defendants have deprived him his First Amendment right guaranteeing free religious exercise because Odinist

---

[1] Plaintiff alleges that he does not exercise in his cell because, in January 2013, he banged his head on a shelf inside his cell.  (Compl., ¶ 53.)

religious services at NJSP occur on Tuesdays and conflict with lunch and/or yard times.  In other words, to attend Odinist services, Plaintiff must miss lunch once a week and yard recreation once every other week.  This particular claim was raised by Plaintiff in a prior lawsuit in this District Court, *Planker v. Ricci, et al.*, Civil No. 07-2679 (AET).

In this prior lawsuit, the Honorable Anne E. Thompson, U.S.D.J., denied Plaintiff's motion for a temporary restraining order on his free exercise of religion claim for lack of success on the merits.  *See Planker v. Ricci*, Civ. No. 07-2679 (AET), 2010 WL 4447281 (D.N.J. Nov. 1, 2010).  Specifically, Judge Thompson ruled:

> Although prisoners retain constitutional protections, their "First Amendment rights must in some respects be limited in order to accommodate the demands of prison administration and to serve valid penological objectives." *Sutton v. Rasheed*, 323 F.3d 236, 252 (3d Cir. 2003) (internal quotations omitted).  Scheduling is but one aspect of the "formidable task of running a prison" to which courts will defer to prison administrators. *O'Lone v. Shabazz*, 482 U.S. 342, 353, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).  In this case, the prison manages to provide 46 different faiths with at least one meeting each week.  (Def.'s Supplemental Br., Suluki Decl. ¶ 3.)  Accommodating this many faiths may require that certain attendees must face scheduling conflicts.  Plaintiff has not shown that Defendant could schedule Odinist services to avoid conflicts with the lunch and yard schedules of other Odinist attendees, let alone that Defendant could schedule all religious services to match the schedules of all attending prisoners.  As a result, Plaintiff cannot demonstrate that his religious exercise has been substantially burdened, as required by the RLUIPA.[2]

*Planker*, *supra*, at *2.

---

[2] The Religious Land Use and Institutionalized Persons Act ("RLUIPA") governs the religious rights of incarcerated individuals at federally funded prisons. RLUIPA bars federally funded prisons from "impos[ing] a substantial burden on the religious exercise of a person ... unless the government demonstrates that imposition of the burden on that person ... (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000cc–1(a). To state a claim under RLUIPA, a prisoner must establish that his religious exercise has been "substantially burdened." Once a claimant satisfies this element, the burden shifts to the government to show that the burden on the prisoner's religious exercise furthers a "compelling governmental interest" and "is the least restrictive means of achieving that interest." *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007).

The allegations in Plaintiff's present lawsuit do not differ from those raised in his earlier dismissed case.  Consequently, for the same reasons expressed by Judge Thompson, this Court finds no constitutional violation, or violation of RLUIPA, with respect to the scheduling of Odinist services, and Plaintiff's claim in this regard is dismissed with prejudice.

Plaintiff offers more allegations, however, than just simply the scheduling of Odinist services.  He also alleges that he was denied his Yule feast, that Odinist services are not conducted on the grass as are other religious services, and that he has been denied use or possession of certain ritual items that Plaintiff contends are "obligatory" for Organic Odians.  In addition, Plaintiff alleges that he is forced to undergo a test for tuberculosis against his religious beliefs.  Plaintiff also alleges that Defendants Barnes and Saluki have made "racist" and "pro-Islamic" comments to Plaintiff about his religious beliefs.  He further contends that all of these actions by Defendants violate not only his right to free exercise of religion but also equal protection under the law.

The First Amendment states that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." U.S. Const. amend. I.  "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted); *DeHart v. Horn*, 227 F.3d 47, 50 (3d Cir. 2000).  Nevertheless, "[t]he mere assertion of a religious belief does not automatically trigger First Amendment protections, however.  To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." *DeHart*, 227 F.3d at 51.  Accordingly, if an inmate's request for items, diet or other issues are not the result of sincerely

31

held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request. *Id.* at 52.

Moreover, a prisoner only "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Thompson v. Smeal*, 513 F. App'x 170, 172 (3d Cir. 2013) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). To determine whether a regulation infringing upon constitutional rights is reasonable, courts apply the four factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987). These factors oblige courts to consider: (1) "whether the regulation bears a 'valid rational connection' to a legitimate and neutral government objective;" (2) "whether there are alternative means of exercising the right that remain open to prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) "the absence of ready alternatives." *Id.* at 89–90; *see also Fraise v. Terhune*, 283 F.3d 506, 513–14 (3d Cir. 2002) (citations omitted); *Thompson*, 513 F. App'x at 172.

*Turner* likewise applies to Plaintiff's equal protection claim. *Id.* (citing *DeHart*, 227 F.3d at 61. Prison officials generally cannot discriminate against prisoners of different religions. *Id.* (citing *Cruz v. Beto*, 405 U.S. 319 (1972) (per curiam)). However, an inmate "cannot obtain relief if the difference between the defendants' treatment of him and their treatment of [inmates of another religion] is 'reasonably related to legitimate penological interests.'" *Id.* at 173 (citing *DeHart*, 227 F.3d at 61).

In this case, Plaintiff has identified his faith for purposes of obtaining a special diet and ritual items, although he has not alleged facts sufficient to show that Defendants actually

prevented him from praying in the required manner of his religion.  Plaintiff simply recites that Defendants' actions have pressured him to violate his sincerely held religious beliefs.  Such statement by Plaintiff is simply a conclusory legal statement, which fails to provide sufficient factual allegations to support a plausible claim at this time.  *See Iqbal*, 556 U.S. at 676, 678. Moreover, his allegation concerning the requirement that he submit to a tuberculosis ("TB") test against his religious beliefs is subject to dismissal because Plaintiff has failed to allege facts sufficient to show that the TB test substantially burdens his religious exercise.  *See Riley v. DeCarlo*, 532 F. App'x 23, 29 (3d Cir. 2013).  Accordingly, Plaintiff's free exercise and equal protection claims regarding the practice of his religion will be dismissed without prejudice for failure to state a claim at this time.

E.  Denial of Medical Care

Plaintiff also alleges that Defendants have denied medical care in violation of the Eighth Amendment.   To state a cognizable Eighth Amendment claim for denial of medical care, the Third Circuit has required the following:

> For the delay or denial of medical care to rise to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, a prisoner must demonstrate "(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious."  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).   Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety."  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).  We have found deliberate indifference where a prison official: "(1) knows of a prisoner' need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended treatment."  *Rouse*, 182 F.3d at 197.  Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... (which) remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).  Allegations of negligent treatment

> or medical malpractice do not trigger constitutional protections. *Estelle v. Gamble*, 429
> U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

*Pierce v. Pitkins*, 520 F. App'x 64, 66 (3d Cir. 2013) (per curiam).  The Third Circuit also has

noted that deliberate indifference can be found "where the prison official persists in a course of

treatment in the face of resultant pain and risk of permanent injury." *See McCluskey v. Vincent*,

505 F. App'x 199, 202 (3d Cir. 2012) (internal quotation marks and citation omitted).  "A

medical need is serious if it 'has been diagnosed by a physician as requiring treatment,' or if it 'is

so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *See*

*Mitchell v. Beard*, 492 F. App'x 230, 236 (3d Cir. 2012) (per curiam) (quoting *Atkinson v.*

*Taylor*, 316 F.3d 257, 272–73 (3d Cir. 2003) (quoting *Monmouth Cnty. Inst. Inmates v. Lanzaro*,

834 F.2d 326, 347 (3d Cir. 1987))).

In this case, Plaintiff's allegations do not demonstrate a serious medical need.  For

instance, he listed numerous complaints of bed sores, allergies, sore gums from his toothbrush,

pains in his neck and back from not having a pillow, cuts and scrapes on his hands, burns from

hot water in the shower, rashes, muscle spasms, migraines, insect bites, ingrown toe nails,

indigestion/heartburn/acid reflux, sunburn, etc., (ECF No. 1, Compl., ¶ 116), for which he

allegedly did not receive treatment from November 2012 to April 2013.  However, Plaintiff fails

to allege that any of these general conditions or symptoms have been diagnosed by any doctor as

requiring treatment, nor do these conditions or symptoms appear "so obvious that a lay person

would easily recognize the necessity" for treatment by a physician. *See Mitchell*, 492 F. App'x

at 236.

Moreover, while Plaintiff alleges that he did not receive treatment after he complained of

chest pains, dizziness, lightheadedness excessive weight gains and losses, and hunger pangs, he

later admits that he received medical attention, just not the treatment he preferred.  For instance, he admits that he was seen by the medical department on February 27, 2013, after a sick call request for chest pains.  He was given an EKG and was diagnosed with poor eating habits and lack of exercise.  (ECF No. 1, Compl., ¶¶ 110, 111.)  Plaintiff again was treated in April 2013 by Defendant Ivery, a nurse practitioner, for his sore throat and allergies, which had dissipated by his visit, and he complained about hunger pangs and dizzy spells from excess weight loss and gains.  Defendant Ivery advised Plaintiff that he had bad eating habits that contributed to his medical complaints.  These allegations do not show deliberate indifference on the part of Defendants sufficient to rise to the level of an Eighth Amendment violation.

Additionally, Plaintiff alleges that he was denied mental health treatment for his complaints of severe depression, attention deficit and constant sleepiness from October 2012 to April 2013.  Plaintiff eventually was seen in mid-April 2013 by several doctors, who prescribed yard recreation, exercise and medication, which Plaintiff did not want to take.  Again, these allegations do not show deliberate indifference by the medical staff at NJSP; rather, they merely depict Plaintiff's dissatisfaction with his medical services, which is not sufficient to support a claim of deliberate indifference.  *Pierce*, 520 F. App'x at 66.  Finally, Plaintiff complains that he needs new eyeglasses and has not been scheduled for an eye exam, but he does not allege a severe impairment that would suggest a serious medical need.  Plaintiff further asks for nicotine lozenges for his nicotine addiction.  He also alleges that he was not treated for smoke inhalation after a fire broke out in his unit in November 2012, and was not given medication cream for rashes and bites in June 2013.  These complaints do not rise to the level of a serious medical need.

Finally, Plaintiff alleges that he has dental cleaning once every two years instead of the American Dental Association's recommendation of twice each year.  (Compl., ¶ 155.)   Plaintiff does not allege any dental condition that requires cleanings more often than what he receives, nor has he alleged a resulting dental condition that amounts to a serious medical need. Moreover, he admits that he receives routine cleanings although not as much as he would prefer, and certainly sufficient to defeat a claim of deliberate indifference.  Accordingly, this allegation fails to state an Eighth Amendment denial of medical care claim.

This Court is not unsympathetic to Plaintiff's many allegations of medical complaints.  It would seem, however, that Plaintiff is attempting to aggregate a volume of minor ailments to paint a picture of deliberate indifference, but he has not alleged any serious medical need that went untreated for a significant period of time sufficient to show deliberate indifference. Accordingly, Plaintiff has not adequately pled an Eighth Amendment claim of denial of medical care at this time.   This claim is dismissed without prejudice to Plaintiff filing an amended Complaint that would cure the deficiencies as discussed above.

F.  Conditions of Confinement

Prison conditions may amount to cruel and unusual punishment contrary to the Eighth Amendment if they cause "unquestioned and serious deprivations of basic human needs ... [or] deprive inmates of the minimal civilized measure of life's necessities." *Tillman v. Lebanon County Correctional Facility*, 221 F.3d 410, 417–18 (3d Cir. 2000) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *Allah v. Ricci*, 532 F. App'x 48, 51 (3d Cir. 2013); *Gardner v. Lanigan*, Civil No. 13–7064(FLW), 2013 WL 6669230, *3 (D.N.J. Dec. 18, 2013). To state an Eighth Amendment conditions of confinement claim, an inmate must satisfy both an objective and subjective test.  Namely, the prisoner must allege facts plausibly showing (1) objectively, his conditions were so severe that they deprived him of an identifiable, basic human need, such as food, clothing, shelter, sleep, recreation, medical care, and reasonable safety,[3] and (2) defendant was deliberately indifferent to the risk of harm to the plaintiff's health or safety. *See Allah, supra* (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "However, only 'extreme deprivations' are sufficient to present a claim for unconstitutional conditions of confinement." *Dockery v. Beard*, 509 F. App'x 107, 112 (3d Cir. 2013) (citing *Hudson v. McMillian*, 503 U.S. 1, 8–9 (1992)).

Plaintiff alleges a broad array of complaints dealing with the conditions of his confinement in the Ad Seg unit at NJSP.  The first group of complaints involves sanitation and ventilation concerns.  For instance, Plaintiff alleges that, when he was moved to his cell in Ad

---

[3] "Relevant considerations include the length of confinement, the amount of time prisoners must spend in their cells each day, sanitation, lighting, bedding, ventilation, noise, education and rehabilitation programs, opportunities for activities outside the cells, and the repair and functioning of basic physical activities such as plumbing, ventilation and showers." *Dockery v. Beard*, 509 F. App'x 107, 112 (3d Cir. 2013) (quoting *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996)). *See also Riley v. DeCarlo*, 532 F. App'x 23, 26 (3d Cir. 2013).

Seg, it was not cleaned after prior inmates had moved out, and the cell still had urine and feces all over it, including the toilet and urinal.  Plaintiff was not given adequate cleaning supplies to clean his cell.  He complains that the toilet smelled so bad that he did not want to use it until he could no longer hold his urine.  He also complains that the toilet has a metal shelf and edge around the hole, which cause his urine to splash and cuts his genitals when he sits.  Furthermore, there is no hot water available in his cell to aid in cleaning his cell or his person.  Additionally, the water pressure in his cell fluctuates from gushes to trickles, and the water does not turn off, resulting in rust, mold and mildew all over his cell.  Plaintiff also complains about mice, bird and insect infestation in his cell, which causes him to suffer from rashes and inability to sleep. Plaintiff further alleges that windows are broken and exhaust fans are open allowing cold air, rain and snow to come inside the building.  The heating and ventilation system also allegedly does not work, leaving no protection from excessive weather and heat conditions in the Ad Seg unit.  (ECF No. 1, Compl., ¶¶ 17, 37-40, 134, 136, 137, 150, 156.)   These allegations appear to span a period from October 2012 to at least July 2013, when Plaintiff filed this Complaint.

The Court finds that Plaintiff's allegations, if true, may be sufficient to show that the lack of sanitation and ventilation in his cell for an extended period of time of almost one year may pose a substantial risk of serious harm, and as such, may constitute an "extreme deprivation" in living conditions necessary to support an Eighth Amendment conditions of confinement claim. Accordingly, this claim, limited to these alleged conditions, will be allowed to proceed at this time.

Plaintiff also alleges that he is not permitted to purchase certain items from the commissary while he is in Ad Seg, and that he is unable to buy other items because of his $15.00

limitation per month.  These items include laundry bags and detergent, bowls, cups and eating utensils, sewing kits, a pillow, more than 2 toothbrushes per month, dental floss, a watch, and nail clippers.  Plaintiff further complains that items cost too much in the commissary.  For instance, he prefers to use Sensodyne toothpaste, Neutrogena soap and Head and Shoulders shampoo, but the cost is more than the allotted monthly purchase limit.  He admits that he is provided monthly bags of pens and paper, toothpaste and deodorant, but dry-skin lotion, lip balm, wash cloths and cotton swabs are not included, and must be purchased within the $15.00 monthly limit.  Thus, Plaintiff complains he cannot stock up on certain items from the commissary.  (Compl., ¶¶ 20, 21, 28, 31-35.)

The loss of canteen or commissary purchasing privileges does not violate the Constitution.  *See Pelzer v. Shea*, 470 F. App'x 62 (3d Cir. 2012) (inmate has no protected liberty interest in canteen privileges); *see also Landor v. Lamartiniere*, 515 F. App'x 257, 259 (5th Cir. 2013) (same); *Grady v. Garcia*, 507 F. App'x 812, 814–15 (10th Cir. 2013) (same).  Moreover, Plaintiff admits that he receives monthly bags of necessary items, and that he may purchase most of his preferred items, but not all at once or in advance to stock up.[4]  Thus, Plaintiff cannot show that prison officials have otherwise deprived him of basic necessities; nor can he show that he has been deprived of non-necessities available for purchase at the commissary.  Therefore, this aspect of his Eighth Amendment conditions claim is dismissed with prejudice for failure to state a claim.

---

[4] The only exception is that Plaintiff is not allowed a standard pillow in Ad Seg.  This item alone is not significant to constitute an extreme deprivation in violation of the Eighth Amendment. *See, e.g., McDaniels v. Elfo*, 2013 WL 7231585, *15 (W.D. Wash. Nov. 14, 2013) (holding that plaintiff was denied a pillow or provided a thin mattress does not support a claim of unconstitutional punishment).

Plaintiff also alleges that he is deprived of adequate hygiene and hygiene supplies.  For example, Plaintiff complains that he is limited to three showers per week, and that the shower water is too hot.  There are no wash buckets or hot water in his cell to hand-wash his clothing.  He cannot have beard trimmers or a flexible mirror in Ad Seg to aid in shaving or removing debris from his eyes.  Disposable razors are provided inmates once every five days in the shower, and the razors are often clogged with hair and are stored in a cabinet that is never cleaned.  Plaintiff also complains that these razors are handled by officers who do not wash their hands.  Likewise, Plaintiff complains that, during strip searches, he has to remove his dirty socks and underwear, spread his buttocks, and then trace his fingers along the inside of his mouth, without being able to wash his hands with hot water.  Oftentimes, these strip searches are conducted right before he is served his lunch.[5]  Haircuts are permitted once a month, and Plaintiff cannot shower afterwards so his bedding contains hair that causes him irritation and itching.  Finally, Plaintiff alleges disparate treatment because "non-European" inmates can order

---

[5]  To the extent Plaintiff may be alleging a claim that his strip searches are unconstitutional, such claim is dismissed with prejudice.  The Supreme Court recently held that it is constitutional to conduct a full strip search of an individual detained in the general population of a jail, regardless of the reason for detention or the existence of reasonable suspicion that the individual is concealing something.  *Florence v. Bd. of Chosen Freeholders of Cnty. Of Burlington*, --- U.S. ----, 132 S.Ct. 1510, 1516–17, 182 L.Ed.2d 566 (2012) (holding that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities.... The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials," so that, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations[,] courts should ordinarily defer to their expert judgment in such matters.")  In this case, Plaintiff is a convicted prisoner and he alleges that the strip searches occurred when he returned from the yard to his cell.  This allegation fails to allege any facts to show that "the strip search was so outside the scope of a reasonable search policy that it would rise to the level of a Fourth Amendment violation." *Aruanno v. Allen*, 498 F. App'x 160, 162–63 (3d Cir. 2012) (citing *Florence*, 132 S.Ct. at 1517).

creams that remove facial and head hair, but "those creams cause burns and irritation when used by Europeans."  (ECF No. 1, Compl., ¶¶ 18, 19, 20-24, 25, and 45.)

In a prisoner case, non-functioning water heaters for inmate showers were found to be one of various conditions at the prison that failed to meet constitutional standards.  *See Grohs v. Yatauro*, 984 F.Supp.2d 273, 285 (D.N.J. 2013) (citing *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 595 F. Supp. 1417, 1432 (D.N.J. 1984) (finding inadequate hot water as one of numerous factors contributing to unconstitutional conditions of confinement for both inmates and pre-trial detainees)).  In this instance, Plaintiff does not allege lack of hot water during his shower; rather, he complains that the water is too hot.  Specifically, Plaintiff complains that he burned his hand when touching the copper pipe in the shower.  This single incident alone does not rise to the level of an Eighth Amendment violation, especially where the incident involved Plaintiff touching the pipe that knowingly delivers hot water, especially where metal conducts and holds heat.  Moreover, the limitation of Plaintiff's showers to once every three days does not violate the Eighth Amendment.  *See Dockery*, 509 F. App'x at 113 (finding that limiting inmates to weekly showers is not unconstitutional under the Eighth Amendment) (citing *Davenport v. DeRoberts*, 844 F.2d 1310, 1316 (7th Cir. 1988)).  Likewise, Plaintiff is afforded constitutionally adequate haircuts for grooming.  *See Williams v. Lackawanna Cnty. Prison*, No. 4:CV–07–1137, 2010 WL 1491132, at *7 n. 9 (M.D.Pa. Apr.13, 2010) (holding that providing inmate with a haircut only once a month does not constitute a violation of Eighth Amendment) .  *See, e.g., Black v. Cuomo*, 101 F.3d 681 (2d Cir. 1996) (unpublished opinion) (noting that the denial of haircuts is not actionable under the Eighth Amendment).  Finally, Plaintiff's allegation regarding the provision of razors fails to state a cognizable Eighth Amendment claim at this time.  Plaintiff

fails to allege that Defendants were deliberately indifferent to his claim that the handling of razors by correctional officers without gloves created a substantial risk of harm.  Moreover, inmates in Ad Seg are generally placed there due to security concerns, and limitations regarding access to dangerous items such as a razor do not rise to the level of deliberate indifference necessary to support an Eighth Amendment claim.  *See Pepper v. Carroll*, 423 F. Supp.2d 442, 449 (D.Del. 2006); *Anthony v. Bauman*, No. 2:05-CV-64, 2006 WL 2548617, *6 (W.D. Mich. Sep. 1, 2006).   Accordingly, these claims regarding issues of hygiene, grooming and hygiene supplies are dismissed without prejudice for failing to state an Eighth Amendment violation at this time.

Plaintiff also appears to complain that he is exposed to female correctional officers and other prison personnel when showering, so he is "forced" to wear his clothes while showering for privacy.  However, his wet clothes and towels cannot be dried sufficiently afterwards because there is no place to hang them in his cell.  (ECF No. 1, Compl., ¶¶ 18-19.)  This allegation fails to state a claim of a constitutional deprivation and must be dismissed.  *See Garrett v. Thaler*, 560 F. App'x 375, 380-81 (5th Cir. 2014) (holding that the presence of female correctional officers near naked inmates did not violate their privacy rights) (citations omitted).  Moreover, Plaintiff's decision to shower in his clothes is a personal choice and does not demonstrate that Defendant's conduct violated his Eighth Amendment rights in any way.

Plaintiff next alleges that his sheets and blankets are torn and do not fit his entire bunk. He also complains that he does not receive dental floss, and lacks access to movies and cable television.  In addition, almost everything in the Ad Seg is made of metal, in particular, his cell door and the shower gate, which have rusted and jagged edges such that Plaintiff often sustains

cuts and scrapes from contact. He alleges that he has requested Defendant Dave Hoffman to repair the rusted metal but no repairs have been made. The Court finds that these allegations also fail to state an Eighth Amendment violation. Indeed, Plaintiff's complaints amount to nothing more than allegations of uncomfortable living conditions, which do not rise to the level of an Eighth Amendment claim. *See Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012) (citing *Preston v. Smith*, 750 F.2d 530, 534 (6th Cir. 1984) (finding no Eighth Amendment violation where prisoner alleged that his segregation cell lacked a mattress or hot water); *Coleman v. Governor of Michigan*, 413 F. App'x 866, 875 (6th Cir. 2011) (holding that complaints of "lack of access to televisions, better shoes, specific dental products and different lighting" did not state a claim of an Eighth Amendment violation)). Therefore, these claims will be dismissed without prejudice for failure to state a claim at this time.

G. <u>Diet and Lack of Nutrients Claim</u>

Plaintiff also alleges that he is denied adequate food and nutrients in violation of the Eighth Amendment. As stated above, serious deprivation of basic human needs, such as food, may be sufficient to support a claim of an Eighth Amendment violation. *See Mearin v. Greene*, 555 F. App'x 156, 159 (3d Cir. 2014). Plaintiff must support such claim by alleging facts sufficient to show an objective deprivation of a basic human need and deliberate indifference by Defendants. *See Rhodes*, 452 U.S. at 337, 347; *Allah*, 532 F. App'x at 51.

Plaintiff first alleges that inmates in Ad Seg receive less food than general population inmates. For instance, soup, muffins and donuts are not served in Ad Seg. (Compl., ¶ 42.) Further, as a vegan pursuant to his Organic Odian beliefs, with claims of lactose and gluten

intolerance[6] and nut allergies, he contends that the vegetarian diet he is given contains less nutrients and calories than a regular diet. He also alleges that the vegetarian diet contains a lot of milk and cheese, which he cannot consume due to lactose intolerance. Consequently, he receives less nutrients, protein and calories than other inmates who are not on a restricted diet.

Plaintiff also complains that his food is not served in a sanitary manner. He alleges that "meal runners" handle food trays without wearing gloves or hair nets, they are not checked for medical clearance like other food workers or cooks, and they are not trained to wash their hands before serving trays. He also alleges that the coffee and juice containers are not cleaned. (*Id.*, ¶¶ 74-76.) Plaintiff further complains that the quality of the food being served is inferior. Salads taste like pesticides. Fruits are often old, dried out, or rotten. Vegetables are cooked so much that they lose any nutritional value. Plaintiff also alleges that better quality food is offered in the Officer's Dining Room compared to the food served to the prisoners, despite the fact that the same food service is used for both. (*Id.*, ¶ 81.)

Prisons must provide nutritionally adequate food to its inmates. *Laufgaus v. Speziale*, 263 Fed. App'x 192, 198 (3d Cir. 2008) (non-precedential). The food must be served in a sanitary manner, but it need not be appetizing. *Jackson v. Gordon*, No. 3:03-CV-1725, 2014 WL 690643, *11 (M.D. Pa. Feb. 24, 2014) (citing *Maldonado v. McFaden*, No. 94–1477, 1994 U.S. Dist. LEXIS 16837, at * 11 (E.D.Pa. Nov. 23, 1994); *Jones v. Beard*, No. 10–5544, 2011 WL 3611470, at *8 (E.D.Pa. Aug.16, 2011) (citation omitted)). Only a substantial deprivation of food to a prisoner sets forth a viable Eighth Amendment claim. *Jackson, supra* (citations omitted).

---

[6] The Court notes that Plaintiff's professed gluten intolerance would necessarily restrict his diet with regard to foods such as donuts and muffins, which typically contain gluten and are made with wheat flour.

Here, the allegations in the Complaint show that Plaintiff was provided with a vegetarian diet. However, Plaintiff contends that the vegetarian diet he received was nutritionally inadequate with respect to calories, protein, and other nutrients. He admits that he refused to eat most of the meals served for various reasons, ranging from alleged dietary and allergic restrictions to concerns over sanitary service. Despite his refusal to eat, Plaintiff alleges that he was seen by medical personnel and that he had gained weight. There was no indication that he was suffering malnutrition other than Plaintiff's conscious decision to forego the vegetarian diet that was served to him. These allegations do not satisfy *Iqbal*'s plausibility standard. *Iqbal*, 556 U.S. at 678-79. Indeed, in this case, Plaintiff's "claim of a constitutional injury premised on his own refusal to eat anything when he was served [allegedly deficient] vegetarian meals does not state a violation of a constitutional right." *Travillion v. Leon*, 248 Fed. App'x 353, 356 (3d Cir. 2007). *See also Laurensau v. Romarowics*, 528 F. App'x 136, 139-40 (3d Cir. 2013) (finding that allegations of a modified diet do not rise to the level necessary to support a claim of an Eighth Amendment violation). [7] Therefore, in light of Plaintiff's own allegations that he declined to eat the vegetarian meals served to him, Plaintiff fails to satisfy the objective component of an Eighth Amendment claim.

Nor do Plaintiff's allegations satisfy the subjective component of an Eighth Amendment conditions of confinement claim. Here, as discussed in § E of this Opinion, *supra*, Plaintiff's allegations support the conclusion that prison officials and medical staff responded reasonably to

---

[7] Plaintiff also alleges that, on several occasions, he did not receive a vegetarian tray because of a delay in transferring his records when he was moved from one housing unit to another. However, Plaintiff does not allege that he was deprived of food completely, and he was eventually served his vegetarian trays after the matter was brought to the attention of prison officials. Thus, this allegation likewise does not rise to the level of an Eighth Amendment violation.

45

Plaintiff's complaints concerning his diet. He was seen by medical staff and was advised that his complaints were based on Plaintiff's refusal to eat. Further, Plaintiff does not allege facts sufficient to show that any Defendant willfully deprived Plaintiff of food or acted with deliberate indifference to his dietary needs. Thus, because the Complaint makes no non-conclusory factual allegations showing deliberate indifference, the Complaint fails to satisfy the subjective component of an Eighth Amendment conditions of confinement claim, and such claim regarding Plaintiff's diet must be dismissed without prejudice.

Plaintiff further alleges that he is deprived of drinking water. The water in his sink is discolored and has a bad odor so he cannot drink it, and Plaintiff can order only six bottles of water at one time. (Compl, ¶ 73.) Federal courts have held that the Eighth Amendment requires that "[w]ater that is suitable for drinking and bathing" be supplied to inmates. *Bellezza v. Fischer*, No. 05 Civ. 98 (DEC), 2006 WL 3019760, at *4 (S.D.N.Y. Oct.24, 2006); *Cruz v. Jackson*, No. 94 Civ. 2600(RWS), 1997 U.S. Dist. LEXIS 1093, at *19–20, 1997 WL 45348 (S.D.N.Y. Feb.4, 1997) ("Because contaminated water may pose serious health problems, an allegation that prison officials persistently provided only rusty drinking water would satisfy the objective component of an Eighth Amendment claim."); *Donahue v. Conn. Dep't of Corr.*, No. 3:11–cv–656 (CFD), 2011 U.S. Dist. LEXIS 105447, at *4 (D.Conn. Sept. 16, 2011) ("potable water constitutes a basic human need"). However, while a consistent supply of contaminated drinking water may constitute an Eighth Amendment violation, "[a]n isolated serving of rusty water would not give rise to an Eighth Amendment claim." *Cruz*, 1997 U.S. Dist. LEXIS 1093 at *7, 1997 WL 45348; *see also Liffiton v. Kiszewski*, No. 09–CV–994A(F), 2010 WL 2869570,

at *5 (W.D.N.Y. July 1, 2010) ("limited exposures [to unconstitutional conditions] do not constitute due process violations").

Here, Plaintiff admits that he receives water bottles for drinking, although it appears that he would prefer more than he receives.  Thus, he has failed to allege sufficient facts to show that the Defendants are deliberately indifferent to Plaintiff's health or safety.  *See Wolf v. Christie*, No. 10-2083 (ES), 2013 WL 3223625, *6 (D.N.J. Jun 25, 2013).  Accordingly, this claim also is dismissed without prejudice.

Plaintiff further complains that he is unable to purchase organic food in the commissary. Plaintiff claims that there is a disparity in access to religious foods "because there are Kosher and Halal foods available on commissary and through food packages for Jewish and Muslim prisoners, but there are no 100% whole organic foods available for Plaintiff."   (Compl., ¶¶ 77-80.)  This allegation also fails to state an Eighth Amendment claim.  Plaintiff admits that certain natural or organic foods are available for purchase, but not fresh vegetables or fruits.  It would appear that the approved food vendors do not provide the types of food Plaintiff prefers. Nevertheless, Plaintiff is served a vegetarian diet in prison, and his access to ordering organic food through an approved vendor is not restricted unless he has incurred a disciplinary charge. Therefore, because Plaintiff's allegations do not show a substantial deprivation of food necessary to state a viable Eighth Amendment claim, this claim must be dismissed without prejudice at this time.

Next, Plaintiff alleges that his dietary restrictions based on religious beliefs are disregarded by the prison.  (Compl., ¶¶ 63-71.)  A prison's failure to provide meals that comply with an inmate's religious dietary restrictions can give rise to a First Amendment claim.  *See*

*Williams v. Morton*, 343 F.3d 212, 215–16 (3d Cir. 2003).   There is, under the Free Exercise

Clause, "a constitutional right not to be forced into a Hobson's choice of either eating food items

which offend one's religious beliefs, or eating very little or not at all."   *Norwood v. Strada*, 249

F. App'x 269, 272 (3d Cir. 2007).   Plaintiff bears the burden to show that Defendants' alleged

failure to provide him with an adequate vegan diet has substantially burdened the practice of his

religion.   *Washington v. Klem*, 497 F.3d 272, 277–278 (3d Cir. 2007). The Court of Appeals has

held that,

> [f]or the purposes of RLUIPA, a substantial burden exists where: (1) a follower is forced
> to choose between following the precepts of his religion and forfeiting benefits otherwise
> generally available to other inmates versus abandoning one of the precepts of his religion
> in order to receive a benefit; OR (2) the government puts substantial pressure on an
> adherent to substantially modify his behavior and to violate his beliefs.

*Id.* at 280 (capitalization in original).   Once a viable claim is asserted, the Government has the

burden of demonstrating the burden furthers a compelling governmental interest and is the least

restrictive means of doing so.   *See id.* at 277–78.

In this case, Plaintiff has failed to allege any facts to show that the vegetarian diet served

to him has substantially burdened his religious practice in any way.   Rather, Plaintiff alleges only

alleged deficiencies in the diet with respect to calories, the types of food offered, and his alleged

lactose and gluten intolerance and nut allergy.   Thus, this claim likewise is dismissed without

prejudice.

Finally, Plaintiff alleges that his requests to be provided with information pertaining to

the ingredients in the food he is served are ignored.   (*Id.*, ¶ 145.)  This allegation completely fails

to state a claim of constitutional dimension, and is dismissed accordingly.

H.  Retaliation Claim

Plaintiff also alleges that Defendant Barnes allegedly retaliated against Plaintiff by placing him in a cell behind an old heater that blocks sunlight from reaching Plaintiff. The heating unit is never cleaned and has rotting food and mice feces under it. (Compl., ¶ 126.) Barnes also allegedly threatened to punish Plaintiff, by putting him on the "dungeon flats" where there is mice infestation and no sunlight due to the old heating unit, if Plaintiff continued to file grievances. Plaintiff alleges that he continued to file grievances and Barnes then moved Plaintiff to the only dungeon-like area in Ad Seg. Plaintiff alleges that his cell-mate who was sanctioned at the same time as Plaintiff, went to Level 2 and was promptly moved to the lighter, fan-exposed tiers in February 2013, but Plaintiff remained in the dungeon-like cell even though he was a Level 2. Plaintiff alleges that Barnes told him that Plaintiff would never be able to prove anything and that Barnes would charge Plaintiff with fraud and lying if Plaintiff complained. Barnes allegedly told Plaintiff that he did the same to another inmate, who confirmed this retaliatory treatment to Plaintiff, so Plaintiff refrained from filing a lawsuit at that time. (*Id.*, ¶¶ 138, 139.)

The Court construes these allegations as asserting a retaliation claim against Defendant Barnes. "A prisoner alleging retaliation must show (1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Mack v. Yost*, 427 F. App'x 70, 72 (3d Cir. 2011) (per curiam) (quoting *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). *See also Monroe v. Phelps*, No. 12–3489, 2013 WL 1397820, *2 (3d Cir. Apr. 8, 2013); *Smith v. Hayman*, 489 F. App'x 544, 548 (3d Cir.2012); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)

(alteration in original) (internal quotation marks omitted).   If Plaintiff can establish a prima facie case of retaliation, then the burden shifts to Defendants "to demonstrate that even without the impetus to retaliate he would have taken the action complained of."   *Hartman v. Moore*, 547 U.S. 250, 260 (2006); *Monroe,* 2013 WL 1397820 at *2.

Here, it appears that Plaintiff has pled factual allegations satisfying the three requisite elements of a retaliation claim.   Specifically, he alleges that Defendant Barnes moved Plaintiff to a "dungeon"-like, mice and insect-infested cell with no sun light after Plaintiff continued to file grievances about the conditions of his confinement.   Plaintiff states that Defendant's conduct initially deterred him from filing a complaint.   He also alleges that Barnes directly told him that he would take this retaliatory action against Plaintiff, and that he had done this to another inmate, because Plaintiff had been filing grievances.   Therefore, this retaliation claim may proceed at this time as against Defendant Barnes.

I.   Forced Servitude without Pay Claim

Plaintiff also contends that he is forced to work without compensation.   Namely, he had to clean his cell, the showers and remove debris on his tier, as well as hand out food, juice, coffee and supplies on his tier, from November 2012 to July 2013, without pay.   (Compl., ¶ 43.) Plaintiff further alleges that, from July 2011 to October 2012, he was forced by Defendants Warren, Barnes and Hoffman to perform various skilled jobs, ranging from plumbing, electrical and painting, in exchange for para-professional pay of $5.00 per day, reimbursement for materials used, approval of Plaintiff's father and brother for visitation, and Odinist services to be held in the 3-wing garden.   He alleges that he was denied painter's pay on two occasions, and the other privileges were not provided as promised.   (*Id*., ¶¶ 127, 140, 141.)

It would appear that Plaintiff is alleging that Defendants have taken his labor and have not paid Plaintiff the full value of his work. Plaintiff admits that he has been paid a $5.00 daily wage for his services in plumbing, electrical and painting work, except on only two occasions. Moreover, Plaintiff's institutional account statement attached to his application for IFP status shows that Plaintiff has received institutional pay.

It is well settled that prisoners have no inherent constitutional right to a prison job and no inherent constitutional right to wages for work performed while incarcerated. *See Carey v. Johnson*, No. 06-1578, 2008 WL 724101, *9 (W.D. Pa. Mar. 17, 2008) (citing *Washlefske v. Winston*, 234 F.3d 179 (4th Cir. 2000); *Beatty v. DeBruyn*, 77 F.3d 484 (Table), 1996 WL 80168, at *1 (7th Cir. 1996) ("[I]f prison officials can constitutionally require inmates to work without pay, they can certainly deny prisoners pay for doing nothing."); *Vanskike v. Peters*, 974 F.2d 806, 809 (7th Cir. 1992), *cert. denied*, 507 U.S. 928 (1993); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (prisoner has no constitutional right to prison employment or a particular prison job); *Draper v. Rhay*, 315 F.2d 193, 197 (9th Cir.) (noting that, because the Thirteenth Amendment excludes convicted criminals from the prohibition of involuntary servitude, prisoners may be required to work without pay), *cert. denied*, 375 U.S. 915 (1963); *Sigler v. Lowrie*, 404 F.2d 659, 661 (8th Cir. 1968) (noting that there is no Constitutional right to compensation for prison work; compensation for prison labor is "by grace of the state."), *cert. denied*, 395 U.S. 940 (1969). *See also Murray v. Miss. Dept. of Corr.*, 911 F.2d 1167,1167-68 (5th Cir. 1990) ("Compelling an inmate to work without pay is not unconstitutional ... compensating prisoners for work is not a constitutional requirement but, rather, is by the grace of the state"). Additionally, "[there is no federally protected right of a state prisoner not to work

while imprisoned after conviction ...*" *Stiltner v. Rhay*, 322 F.2d 314, 315 (9th Cir. 1963); *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).  Consequently, a sentenced inmate may reasonably expect to be required to work without compensation as a result of his conviction. *See Northrop v. Federal Bureau of Prisons*, No. 1:08-cv-0746, 2008 WL 5047792, *9 (M.D. Pa. Nov. 24, 2008).  Rather, Plaintiff must show that he has a property interest in prison wages, protected by the Fourteenth Amendment, to succeed in his § 1983 suit.  *Carey,* 2008 WL 724101 at *9.

Here, Plaintiff has failed to allege any facts to show that he has a property interest in wages protected by the Fourteenth Amendment.  Further, Plaintiff's allegations concerning his performance of intra-prison work do not impose an atypical and significant hardship on Plaintiff. *See Northrop,* 2008 WL 5047792 at *9.  *See also Sandin v. Connor*, 515 U.S. 472, 485-486 (1995) (holding that due process liberty interests are implicated when the conditions of confinement impose atypical and significant hardship on the inmate that are a dramatic departure from the ordinary incidents of prison life).   In addition, Plaintiff's allegation that he was not allowed visitation with his father and brother in exchange for intra-prison work fails to state a claim of constitutional dimension.  *See Overton v. Bazzetta*, 539 U.S. 126, 134 (2003) (upholding a variety of prison regulations limiting contact and non-contact visitation, reasoning that "[w]ithdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior ...").   Thus, this Court finds that Plaintiff has not raised a constitutional violation with respect to his alleged forced labor and the alleged failure to pay claim, and this claim is dismissed with prejudice accordingly.

J.  Miscellaneous Claims

Plaintiff also has a sundry list of complaints about various incidents or deprivations while confined at Ad Seg in NJSP since October 2012.  For instance, Plaintiff complains that he sees 15% of the movies shown, less than 30 educational videos were shown in two years, cable television is limited for no reason, and there are Spanish-speaking movies shown every week without sub-titles.

Plaintiff also alleges that he has been denied dental floss, that he cannot order containers to store his personal property in his infested cell, that he cannot buy a fan, cups, bowls and utensils, that he cannot order literature about growing medical marijuana, that he cannot write a book or any publications, that he cannot have a radio in Ad Seg like other inmates, that administrative memoranda are posted on video and unit bulletin boards to which Plaintiff does not have easy access, and that he is forced to live in a cell with "hate-filled non-whites."

None of these allegations, either alone or in the aggregate, amount to a cognizable claim of extreme deprivation regarding adequate food, shelter, clothing, medical care, and safety measures in violation of the Eighth Amendment.  *See Farmer*, 511 U.S. at 834, 837; *Allah*, 532 F. App'x at 51.  Therefore, these claims are dismissed with prejudice for failure to state a claim.

Plaintiff also alleges that his commutation credits were not restored even after he went a long period of time with no disciplinary charges.  (*Id.*, ¶ 142.)   However, Plaintiff's claim seeking restoration of commutation credits is not cognizable under § 1983.  "[W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973); *see also Brown v. Fauver*, 819 F.2d 395 (3d Cir. 1987) (inmate's civil

53

rights action seeking restoration of good time credits was in essence an action seeking habeas corpus relief which is not cognizable under § 1983); *Ford v. Hughes*, No. 11-7029 (RMB), 2012 WL 3228714, * 2 (D.N.J. Aug. 3, 2012).  Accordingly, this claim is dismissed without prejudice.

K.  Supervisor Liability

Finally, Plaintiff's claims against Defendants Governor Christie, Commissioner Lanigan, and Administrators Ricci and Warren will be dismissed without prejudice because they are based on a claim of supervisor liability.  As a general rule, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior* or supervisor liability.  *See Iqbal*, 556 U.S. at 676.  "In order for liability to attach under § 1983, a plaintiff must show that a defendant was personally involved in the deprivation of his federal rights."  *Fears v. Beard*, F. App'x 78, 81 (3d Cir. 2013) (citing *Rode v. Dellaciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)); *Bayete v. Ricci*, 489 F. App'x 540, 543 (3d Cir. 2012) (supervisor liability requires a showing of personal involvement in the alleged wrongs).  "[L]iability cannot be predicated solely on the operation of *respondeat superior*," rather, a plaintiff must show personal involvement "through allegations of personal direction or of actual knowledge and acquiescence."  *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citation omitted); *see also Pressley v. Huber*, 562 F. App'x 67, 69 (3d Cir. 2014); *Walsifer v. Borough of Belmar*, 262 F. App'x 421, 425 (3d Cir. 2008).  In this case, Plaintiff's claims against Defendants Christie, Lanigan, Ricci, and Warren appear to be based primarily on a supervisor liability theory in their capacities as Governor of New Jersey, Commissioner of the Department of Corrections and Administrators at NJSP.  This is an insufficient predicate on which to state a § 1983 claim against these Defendants.

Recently, the Third Circuit reiterated a four-part test for evaluating claims of supervisor liability under § 1983 with respect to supervisory policies and procedures that were allegedly ignored. *See Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 330 (3d Cir. 2014). "To hold a supervisor liable for such an Eighth Amendment violation, the plaintiff must identify a supervisory policy or procedure that the supervisor defendant failed to implement, and prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory procedure." *Barkes*, 766 F.3d at 330 (citing *Brown v. Muhlenberg Tp.*, 269 F.3d 205, 216 (3d Cir. 2001) and *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).

In this case, Plaintiff wholly fails to identify specific acts or omissions of these supervisory Defendants, and the other elements outlined in the four-part test, to evidence deliberate indifference on the part of the supervisory Defendants. Therefore, the Complaint must be dismissed without prejudice as against these Defendants accordingly.

## V.  CONCLUSION

For the reasons set forth above, the Complaint will be dismissed without prejudice, in its entirety, as against Defendants Governor Christie, Commissioner Lanigan, and Administrators Ricci and Warren, because the asserted claims are impermissibly based on supervisor liability. Further, Plaintiff's claims asserting denial of access to the courts, denial of religious exercise, denial of medical care, denial of an adequate religious diet, and miscellaneous claims regarding his conditions of confinement (for instance, lack of adequate hygiene and grooming supplies,

haircuts, razors, etc.) are dismissed without prejudice, as against all named Defendants, for failure to state a cognizable claim under 42 U.S.C. § 1983 at this time, pursuant to 28 U.S.C. §§ 1915(e)(2)(b)(ii) and 1915A(b)(1).   Plaintiff's claims asserting denial of disciplinary due process, denial of recreation, denial of prison pay, and the miscellaneous claims alleging denial of dental floss, denial of commissary privileges to purchase certain items, denial of literature on growing marijuana, etc., are dismissed with prejudice, as against all named Defendants, for failure to state a claim, pursuant to 28 U.S.C. §§ 1915(e)(2)(b)(ii) and 1915A(b)(1).   However, Plaintiff's claim asserting retaliation in violation of his First Amendment rights shall proceed at this time against Defendant Barnes, and his claim alleging unsanitary conditions and lack of ventilation in violation of the Eighth Amendment shall proceed against Defendants Barnes and Hoffman.   An appropriate order follows.

_____
MICHAEL A. SHIPP
United States District Judge

Dated: 1/20/15